# Richmond

GENERAL FIDELITY LIFE INSURANCE COMPANY v. THE BANK OF CALLAO, ETC., ET AL.

November 29, 1965.

Record No. 6050.

Present, All the Justices.

*Paul M. Shuford* (*Wallerstein, Goode, Adamson & Dobbins,* on brief), for the plaintiff in error.

*George Mason, Jr.* (*Thomas A. Williams; Dabney Overton,* on brief), for the defendants in error.

BUCHANAN, J., delivered the opinion of the court.

■ This action was brought by the administrator of the estate of Herbert J. Garner, deceased, against The Bank of Callao, herein called the Bank, branch of The Bank of Westmoreland, Incorporated, and General Fidelity Life Insurance Company, herein referred to as Fidelity, on a renewal note made by Garner to the Bank for $1500, dated January 12, 1963, payable six months after date. Garner died on April 7, 1963. Plaintiff alleged that Fidelity was obligated to pay the amount of the note to the Bank under a policy of credit life insurance issued by Fidelity on the life of Garner.

The Bank filed an answer and grounds of defense in which it denied the allegation of the motion for judgment that it was Fidelity's agent in the issuance of the policy, but admitted that a policy was issued by Fidelity which if paid would discharge the note. The Bank also filed a counterclaim against the plaintiff administrator for the amount of the note, and a cross-claim against Fidelity on its insurance policy.

By consent the court tried the case without a jury and after hearing the evidence, and for reasons stated in a written opinion, granted to the Bank a judgment against Fidelity for $1500 on the Bank's cross-claim, and a judgment for $1500 against the plaintiff administrator on the Bank's counterclaim. We granted to Fidelity a writ of error to the judgment against it.

Fidelity alleges that a number of errors were committed in the trial, but states in its brief that these were largely procedural matters and that it desires a decision on the merits of the case. This leads to the main question of whether Fidelity is required by its credit life insurance policy on the life of the decedent Garner to pay to the Bank his $1500 note of January 12, 1963. A secondary question is on the refusal of the court to admit in evidence some correspondence between Fidelity and the Bank's cashier.

The $1500 note in question was a renewal of a $2500 note made by Garner to the Bank in 1961, on which $1000 was paid a year

later, followed by two additional renewals and the final renewal on January 12, 1963.

On June 27, 1960, pursuant to a written application of that date made by the Bank by its cashier, Fidelity issued to the Bank its group policy by which it insured the lives of "certain eligible Debtors" of the Bank and agreed, subject to the terms of the policy, upon the death of the insured debtor, to pay to the Bank the amount of insurance then in force on his life to apply on his indebtedness to the Bank.*

At the date of the execution of the $1500 renewal note, January 12, 1963, the Bank executed and delivered to Garner the "Statement of Insurance" required by the statute as evidence of the fact that this note was covered by insurance in Fidelity. Plaintiff's motion for judgment alleged that the original $2500 note as well as the other renewals had been similarly insured.

After the death of Garner, Fidelity refused to pay the $1500 note to the Bank on the ground that the amount of this note was in excess of the limit of its liability under the terms and conditions of its group policy. It asserted that this limit was $5000 to any one debtor.

At the time of issuance of the insurance on the $1500 renewal note the Bank held another note on Garner for $5500, on which insurance had been issued on December 24, 1962. With respect to this note Fidelity wrote the Bank on February 13, 1963, that it could not insure its full amount "as our policy permits maximum coverage of $5,000.00 on any applicant." The letter requested that the insurance on this note be reduced to $5000 and this was done. After Garner's death Fidelity paid this $5000 to the Bank and it now contends that this is the limit of its liability to the Bank on Garner's indebtedness.

---

* Such insurance was provided for by Acts 1960, ch. 67, which became effective June 27, 1960, now codified as §§ 38.1-482.1 through 38.1-482.16, Code, 1964 Cum. Supp. The act provided, *inter alia*, that the amount of the credit life insurance should not exceed the initial indebtedness, and at no time exceed the amount of the unpaid indebtedness, or $10,000, whichever is less; that such credit insurance, where any part of the premium is paid by the debtor, shall be evidenced by a certificate or statement of insurance, a copy of which shall be delivered to the insured debtor. It must state the name and address of the insurer and of the debtor, the premium, the amount and terms of the coverage and any limitations, exceptions or restrictions, and that the benefits shall be paid to the creditor on the unpaid indebtedness. The act also provides that the agent soliciting the insurance is not the agent of the person insured. A portion of the premium may be allowed by the insurer to the creditor, or its affiliate, or a director, or officer, or an employee of any of them, for providing and servicing such insurance. Insurers and agents are required to be licensed.

There is no evidence to indicate that Garner ever saw or knew anything about the terms and conditions of the group policy. The evidence is conflicting as to the extent of the Bank's knowledge of its provisions. Mrs. Nettie C. Farmer, who was and had been since 1942 the cashier and manager of the Bank, testified as to the origin and history of the insurance as follows:

William F. Penn, vice-president and director of Fidelity, and in charge of selling its insurance, and whom Mrs. Farmer knew personally, was the only representative of Fidelity with whom Mrs. Farmer ever had any contact. He visited the Bank and stated to her that he would like "us" to write credit insurance in his company and they agreed. She had no recollection of ever seeing the group policy until she wrote to Fidelity and asked for a copy after Garner's death. Penn told Mrs. Farmer that she could write this insurance up to $7500.

When the insurance was written on a debtor there was issued in triplicate a certificate or statement of the insurance, one copy of which was delivered to the debtor, as required by the law, and one to Fidelity, identifying the debtor, stating the date and amount of the loan, and that it was insured under the group policy. This was done on the Garner loans. At the end of each month a report was made to Fidelity as to the insurance written in that month and the amount of premium credited to Fidelity. Premiums on the insurance were paid by the debtors to Mrs. Farmer, who divided her share with other employees in the Bank who had obtained the insurance. Fidelity's share of the premiums was credited to its account on the basis of forty-five percent to it and fifty-five percent to Mrs. Farmer. No part of the premiums was paid to the Bank.

The president of the Bank of Westmoreland, Inc., of which the Bank of Callao was a branch, testified that prior to Garner's death he was not acquainted with Fidelity; that Mrs. Farmer had never discussed with him the provisions of the group insurance policy and that he had never authorized Mrs. Farmer to write insurance in Fidelity or any other company; that the Bank received no part of the premiums and that it had never made a loan based on the insurance of the borrower; that the Bank looked upon the matter of insurance as a service to its customers.

The group policy provided in Article IV that "The initial amount of insurance shall be equal to the initial indebtedness or $5,000.00 whichever is less."

The "Statement of Insurance" issued January 12, 1963, covering the $1500 Garner note, in a clause on the back under the heading

"Amount of Insurance" states: "The initial amount of insurance shall be the amount shown on the reverse side hereof [$1500], but shall in no event exceed $5000.00." There is no specific statement in the policy or in the "Statement of Insurance" that $5000 was the limit to one borrower, rather than to one loan. Instead, both speak of the "initial" amount of insurance, and the "initial" indebtedness, words which suggest that there may be subsequent insurance and indebtedness. Certainly this language was not sufficient to give notice to Garner that the insurance which he bought and paid for on the $1500 note was of no effect. There is no evidence that he had any other notice or information. Clearly Fidelity is liable to the plaintiff administrator under its insurance policy as evidenced by the "Statement of Insurance" furnished to her decedent.

█ Fidelity contends, however, that it cannot be required to pay this insurance to the Bank under the terms of its policy because it instructed Mrs. Farmer verbally and by a number of letters to her in 1962 as to this limit of $5000 on each debtor. Only one of these letters, however, spoke of $5000 as being the maximum amount for "any one individual." One speaks of the "normal limitation" of $5000; and in others reference is to specific notes. The letter of February 13, 1963, referred to above, was a month after the insurance on the $1500 note had been written, and it made no objection or reference to the $1500 note.

The report of the insurance issued on the $1500 note was forwarded to Fidelity the last of January, 1963, and no question was raised about it until after Garner's death. Mrs. Farmer testified that Penn, defendant's vice-president and salesman, was present when the insurance on the $1500 note was written. It is also in evidence that in January, 1961, insurance was issued for a loan of $5500, and in February, 1961, insurance was issued for a loan of $5200, both to other borrowers, and both were accepted by Fidelity without any question. Penn himself testified that on a visit to the Bank in September, 1961, he found that insurance had been written to cover a note for $5600 and he did not indicate to Mrs. Farmer in any way that the insurance should be reduced. He also told Mrs. Farmer, he said, that when she wanted to insure above $5000 she could make request to the company by letter or telephone and the company would then determine whether it wanted a physical examination made, or maybe accept the insurance on the basis that the borrower was a good insurance risk.

The vice-president and general manager of Fidelity, Mr. Sutherland, testified that on April 1, 1963, Mrs. Farmer called his office and asked about insuring a loan of $6500 and was told that the insurance could not be in excess of $5000. He was asked the reason for the refusal and stated: "Simply because we felt that the premium volume at the account would not substantiate an amount in excess of five thousand dollars." He stated that Mrs. Farmer then thought that the insurance limit was $7500 and she stated to him that Mr. Penn had told her so.

While there is support in the evidence for the view that Mrs. Farmer was the agent of Fidelity rather than of the Bank in the sale of credit insurance, the court found that the Bank and its employees were agents of Fidelity. But the court also found that the evidence did not establish that the agents had violated their instructions. We agree with the latter conclusion. The language of the policy itself and of the statement of insurance was of uncertain meaning, and it is by no means clear that these instruments imposed a $5000 limit on one person as distinguished from one loan. The vice-president of Fidelity in charge of sales of insurance gave general permission to Mrs. Farmer to exceed that limit, so she testified; policies written in excess of that limitation were accepted by the company without objection, and the policy in suit was not questioned from the time of its issuance in January, 1963, until after the death of the insured in April of the same year.

On the evidence thus produced it cannot fairly be held that the Bank and its agents exceeded their authority to a degree which renders the contract of insurance in this case invalid and unenforceable.

Where a principal's instructions to his agent are clear, precise and imperative, they should be strictly followed; but generally they should not be construed as intended to be obligatory unless they are distinct and positive; "an agent should not be held liable for a departure from the will of his principal where his orders are ambiguous, doubtful, or not explicit." 3 Am. Jur. 2d, Agency, § 206, p. 586.

Forfeitures of insurance policies are not favored and a waiver is readily implied from conduct of the principal which indicates approval of or consent to the agent's acts. "* * 'To hold otherwise would be to maintain that the contract of insurance requires good faith of the assured only, and not of the insurers, and to permit insurers, knowing all the facts, to continue to receive new benefits from the contract while they decline to bear its burdens.'" *Home Beneficial Ass'n* v. *Field*, 162 Va. 63, 69, 173 S.E. 370, 373.

We find no error in the refusal of the court to admit three letters offered by Fidelity, two written by its agents to the cashier of the Bank, one dated in 1956, one in 1957, and the third from the cashier of the Bank to Mr. Penn in 1959, all written before the enactment of the statute and the issuance of the group policy here involved.

Our conclusion is to affirm the judgment of the Bank against Fidelity with direction that upon the payment of the amount of the policy to the Bank the judgment of the Bank against the plaintiff Chloe R. Garner, Administrator of the Estate of Herbert J. Garner, deceased, shall stand satisfied and discharged, as provided by the statute and as conceded to be right and proper by the Bank in its answer to the administrator's suit.

*Affirmed.*